911 So.2d 1018 (2005)
Jerome HOUSTON, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-00856-COA.
Court of Appeals of Mississippi.
September 27, 2005.
*1019 Thomas P. Welch, attorney for appellant.
Office of the Attorney General by Deirdre McCrory, attorney for appellee.
Before KING, C.J., IRVING and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. Jerome Houston was tried and convicted of sexual battery in the Circuit Court of Pike County, Mississippi. He was sentenced to twenty-five years in the custody of the Mississippi Department of Corrections, with five years suspended, twenty years to serve and five years' post-release supervision, and was fined $5,000. From his conviction, Houston appeals to this Court alleging that the jury verdict was against the overwhelming weight of the evidence, and that the district attorney's mention of a polygraph test constituted reversible error. Finding no error, we affirm.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. At the time of Houston's trial, twenty-one-year-old "Jane"[1] was a third-year student at Ohio State University and planned to enter veterinary school in the fall. Her parents were divorced, and her father, a medical doctor, had remarried and moved to Pike County. During the summer of 2003, Jane worked on the farm of Dr. Middleton, a friend of her father, in order to obtain experience working with large animals. Each morning Jane went to Dr. Middleton's farm to feed the horses located in his "big barn" and clean their stalls.
¶ 3. Jerome Houston also worked on Dr. Middleton's farm; however, Jane testified, *1020 she and Houston had little opportunity for contact, as Houston worked primarily in the farm's other barn. Jane testified that she had spoken to Houston only twice during her employment at the farm: once when he asked her to help him place a bandage on his hand, and second when he directed Jane to a supply of additional food for the horses.
¶ 4. On July 26, 2003, Jane arrived at the farm at 7:00 a.m. to perform her usual duties. No one accompanied her, and because Dr. Middleton and his family were out of town, when she arrived no one else was at the farm. Jane testified that as she was sweeping the big barn, Houston entered the property, parking his truck between the two barns. She stated that Houston approached her in the barn and asked her if she knew when the Middletons would be returning. Jane replied that she thought it would be sometime Sunday night. Houston then asked Jane if he could show her something in the other barn, and she agreed and followed him.
¶ 5. Jane testified that when she and Houston arrived at the door to the tack room of the other barn, she "got a weird feeling" and started to back away. At that point, Houston grabbed her arm and attempted to force her into the tack room. Jane testified that she screamed and fought with him, trying to escape. Houston then threw her down on the ground outside the tack room. Several of Dr. Middleton's dogs arrived at the scene, and Jane said she "tried to sic them" on Houston, but Houston kicked the dogs out of the way. Jane testified that when she again tried to escape, Houston pulled a gun out of his pocket, held it to her head and said that he would kill her if she did not cooperate. After Houston put the gun back into his pocket, Jane tried once more to escape, but Houston again caught her. He then threw her, causing her to slide into a stall. Jane stated that Houston held her down so that she could not breathe, and at that point, thinking that she was going to die, she stopped fighting. Houston then pulled her up by her hair and forced her into the tack room. Hoping to deter him, Jane told Houston that she was menstruating; Houston, however, was not deterred. Houston then pulled Jane's pants down, pulled his down as well, and commanded Jane to take his penis into her mouth. She did so. After "a little while" Houston threw Jane down on a sack of feed and put his penis inside her vagina. Jane testified that Houston asked her whether she "liked it," and that she said "yes," again hoping that this would deter Houston from killing her. Finally, Houston stopped.
¶ 6. Jane testified that after the ordeal was over, Houston wiped himself with a towel, offered her one, and asked if he could see her again. She stated that she lied and "told him yes" because she was afraid that if Houston thought she would tell the police, he would kill her or her family. In order to convince Houston that she was sincere and to further her plan of escape, Jane made conversation with Houston and gave him her phone number. She then returned to the big barn and finished sweeping it, afraid that if she left right away Houston would catch her. After about ten minutes of sweeping, Jane started walking to her car. At this point, Houston called after her and asked for a kiss. She stated that she gave him a quick kiss in order to keep him from panicking. Jane then got into her car and left the farm.
¶ 7. Jane drove toward Southwest Regional Medical Center, the hospital where her father and stepmother worked. On the way to the hospital, Jane called her boyfriend. He testified that he could immediately tell that something was wrong, *1021 as Jane's "voice was shaking, and she was extremely upset." He testified that Jane told him that Houston had strangled her, held a gun to her head and raped her, and that during the incident she thought she was going to die. Furthermore, Jane's boyfriend testified that "[Jane] said she had to act like she liked it because she was so afraid that he was going to kill her."
¶ 8. Four staff members from the hospital testified that when Jane arrived at the hospital she was in hysterics and asked repeatedly to see her father. One of the staff members, Felicia Wells, testified that Jane was hysterical and dirty, with her hair "all pulled out of place." Betty Davis, a nurse at the hospital, also testified that Jane appeared scared and hysterical, and noted that Jane had a red mark on her neck.
¶ 9. Jane's stepmother also worked at Southwest Regional Medical Center as a nurse. She testified that when she first saw Jane at the hospital, "Her clothes were dirty. Her hair was all messed up.... Of course, her face was red, you know, she was sobbing, she could hardly breathe. She just looked a mess." She further noted that Jane's throat was red and that she had a bruise on one of her arms, a large bruise on one of her legs, a scratch on her neck and what appeared to be a rug burn on her lower back. Jane's stepmother also testified that when she first saw Jane there was still gravel embedded in the skin on her back. Lastly, Jane's stepmother testified that Jane complained for several days afterward about pain in her head, shoulder and neck. In his own testimony, Jane's father, a doctor, corroborated the descriptions of Jane's injuries and appearance at the time she arrived at the hospital. He also recounted to the jury Jane's description of the attack by Houston.
¶ 10. Jane's father and stepmother escorted her to the hospital's emergency room, where she was examined by nurse Louette Smith and Dr. Scott Smith. Louette Smith, who performed a sexual assault kit on Jane, testified that when Jane entered the emergency room, she was crying and seemed anxious. Nurse Smith also testified that Jane described Houston's attack to her.
¶ 11. Dr. Smith, accepted by the court as an expert in the field of emergency medicine, testified that he examined Jane in the emergency room on the day of the attack. Dr. Smith noted that Jane had fresh injuries such as abrasions and contusions around her neck and lower back, and that there was a fresh bruise on her thigh. Dr. Smith also testified that the condition of Jane's neck was consistent with having been "grabbed by the throat." Dr. Smith did not, however, find any abrasions in Jane's vaginal area. He noted that the fact that Jane was menstruating decreased the chance of vaginal injury and stated that in his experience, injuries to the vagina are not always present in cases of sexual assault.
¶ 12. After Dr. Smith's medical examination concluded, Deputy Mackey Bonnett of the Pike County Sheriff's Department interviewed Jane at the hospital. He testified that when he first saw Jane, she was visibly upset and crying, and had bruises and scratches on her body. Deputy Bonnett photographed Jane and then went to Dr. Middleton's farm to take pictures of the crime scene. Deputy Bonnett testified that when he arrived at the tack room where Jane was assaulted, he found some blue shop towels that matched the description Jane had given him. He further stated that as he was photographing the scene, Houston arrived at the farm in a white truck. Bonnett stated that at that point Deputy Mullins of the Pike County Sheriff's *1022 Department took Houston into custody and retrieved a pistol from the passenger side door panel of Houston's truck. The weapon, Deputy Bonnett testified, "was chambered and had rounds in the clip." Lastly, Deputy Bonnett testified that Houston admitted to the officers that he had sex with Jane.
¶ 13. Dr. Middleton testified that he returned to his farm immediately upon being notified of what had happened to Jane. He stated that when he returned home he found one of his dogs, which had been healthy when he left, limping as the result of an injury. Dr. Middleton then went to the hospital room where Houston was being examined and, in the presence of Deputy Bonnett and Detective Cedric Clark, asked Houston what he had done. Dr. Middleton testified that Houston then admitted having sex with Jane in the barn. According to Dr. Middleton, Houston then told him, "I've got no better story."
¶ 14. At the end of the State's case-in-chief, Houston moved for a directed verdict. The trial court denied the motion, and Houston then proceeded, calling Detective Clark to the stand. Detective Clark testified that he had been the chief investigator in the case, and that he had been present at the meeting between Houston and Dr. Middleton. Clark testified that while he heard Houston say to Dr. Middleton, "I don't know, it just happened," he did not hear Houston say, "I've got no better story." On cross-examination, Detective Clark told the prosecutor that his investigation had been cut short because the district attorney's office requested that the case be turned in before Jane returned to college. In attempting to impeach Detective Clark on his insistence that he had ended the investigation prematurely, the prosecutor asked Detective Clark if he had not, in fact, asked the district attorney's office for permission to administer a polygraph test. Defense counsel objected to the evidence regarding the polygraph test and moved for a mistrial. The trial judge denied the motion.
¶ 15. Lastly, Jerome Houston took the stand in his own defense. On direct examination, Houston testified that he had not raped or battered Jane, and that she claimed he had raped her in order to get back at him for breaking off their relationship. On cross-examination, Houston said that he and Jane had been in an ongoing relationship and had engaged in sexual relations twice before. Furthermore, he stated that Jane asked him to have sex with her on the morning of July 26, 2003. Houston said the sex was consensual, and that he told Jane "during or after we got through with the sex that this was over, the relationship was over, and basically that was it." Houston said that when Jane left the barn that morning, she appeared depressed. Houston further testified that he did not know how Jane's injuries came about. Lastly, Houston stated that Jane was familiar with his gun because he kept it in his truck and Jane had been in his truck before.
¶ 16. Houston was duly convicted of sexual battery and was sentenced to twenty-five years in the custody of the Mississippi Department of Corrections, with five years suspended and five years' post-release supervision, and was fined $5,000. Houston then filed a motion for judgment notwithstanding the verdict, or in the alternative, a new trial, claiming that the verdict was against the overwhelming weight of the evidence and that he was unduly prejudiced by the mention of a polygraph test by the district attorney, both of which motions were denied. Houston then timely appealed to this Court.

ISSUES AND ANALYSIS

I. WHETHER THE JURY VERDICT WAS AGAINST THE *1023 OVERWHELMING WEIGHT OF THE EVIDENCE
¶ 17. When reviewing the denial of a motion for a new trial based on an objection to the weight of the evidence, this Court will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. In evaluating such a motion, the evidence should be viewed in the light most favorable to the verdict. Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005).
¶ 18. Houston claims that there was no physical evidence presented that would prove that an assault occurred. He points to the fact that there were no rips or tears in Jane's clothing and that there was no blood on Jane or her clothing. Furthermore, Houston claims that "[t]he only injury shown is a scratch on [Jane's] neck that she says came when she fell down." Houston also submits that "the State's own expert [Dr. Smith] could not say whether or not a sexual assault had occurred." Lastly, Houston contends that his conviction cannot stand because "the only evidence that the alleged incident occurred is the testimony of the alleged victim."
¶ 19. Confronting Houston's claim of error is an overwhelming amount of evidence suggesting that the assault did in fact take place. Photographs submitted by the prosecution clearly show the presence of Jane's injuries, and a number of witnesses testified to seeing those injuries first-hand. Furthermore, nearly every witness called by the prosecution testified that Jane appeared shaken and hysterical upon arriving at the hospital. In addition, the Sheriff's Department secured the gun used by Houston in the assault and uncovered the towels with which he cleaned himself afterwards. Lastly, Dr. Middleton's testimony regarding his injured dog corroborates Jane's account of the assault.
¶ 20. While Houston is correct in his statement that Dr. Smith could not say with certainty whether an assault took place, Houston ignores the fact that Dr. Smith said in his expert opinion that vaginal injury does not always occur in such assaults. Further, it is the well-settled law of our state that the uncorroborated testimony of the victim of a sex crime "is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence." Scott v. State, 728 So.2d 584, 586 (¶ 17) (Miss.Ct. App.1998). In this case, however, Jane's account was corroborated by a substantial amount of evidence.
¶ 21. Accordingly, viewing the facts recited above in the light most favorable to the verdict, this Court cannot say that the verdict was contrary to the overwhelming weight of the evidence. Houston's assignment of error is without merit.

II. WHETHER THE PROSECUTOR'S MENTION OF THE POLYGRAPH TEST CONSTITUTES REVERSIBLE ERROR
¶ 22. In his case-in-chief, Houston called former Pike County Detective Cedric Clark to the stand. On cross-examination by the State, the following exchange took place:
Q: And nobody from my office ever told you to stop working on this case, did they?
A: No, sir.
Q: In fact you came to me personally and asked for a particular test in this case?
A: Yes, sir.
Q: And you and I sat down and talked and I said do it, go find somebody who can do it, and you did; correct?
A: What test are you referring to?

*1024 Q: You know the test. Don't make me refer to it.
¶ 23. After a bench conference, the trial judge said that he would "allow [the State] to ask the question if the test was performed, but that's as far as [it] can go." The district attorney then resumed his cross-examination of Detective Clark:
Q: Officer Clark, in fact, you came to my office and requested permission to do, conduct a polygraph examination, didn't you?
A: Yes, sir.
¶ 24. After objection by defense counsel, the trial judge excused the jury from the courtroom and the following ensued:
BY THE COURT: All right. My ruling was apparently misunderstood.
BY MR. WELCH [defense counsel]: Your Honor, I want a mistrial. There is no waythat was done intentionally.
BY MR. SMITH [for the State]: My understanding of the Court's ruling is that I could ask the questions about the polygraph examination, but the results were not admissible, that's what I understood the Court's ruling to be.
BY THE COURT: My intention, whether it was clear or not, was that you were going to ask a question about the test, and I didn't specifically say you can't call the test by name. The objection is sustained. Motion for mistrial is overruled.
BY MR. WELCH: Your Honor, all this is going to do, the jury is going to know a polygraph was administered, they will not hear any result, so they will automatically assume that he failed it, which means he's got to be guilty.
BY MR. SMITH: They don't know that a test was conducted. They know that the request was made by the officer. The question was `[D]id you request a polygraph examination,' and his answer wasI don't think he answered, but there's been no evidence before this jury that one was ever conducted.
¶ 25. The judge then ordered the jury to return to the courtroom and instructed them to disregard the question about the polygraph examination. By a unanimous show of hands, the jurors agreed that they would disregard the evidence.
¶ 26. Houston contends that the trial judge erred in allowing the State to elicit testimony from Detective Clark as to whether Clark had requested permission to administer a polygraph test. He also alleges that in mentioning the test by name, the district attorney intentionally violated the trial court's directive that the State could go no further than asking if "the test" was performed.
¶ 27. The Mississippi Supreme Court held in Weatherspoon v. State, 732 So.2d 158, 163 (¶ 15) (Miss.1999), that "any evidence pertaining to a witness's offer to take a polygraph, refusal to take a polygraph test, the fact that a witness took a polygraph test or the results of a polygraph test is inadmissible at trial by the State or by the defense." However, reversal is not necessary in every instance in which such evidence is admitted. Id. Where the claimed error involves the admission or exclusion of evidence, this Court "will not reverse unless the error adversely affects a substantial right of a party." Stallworth v. State, 797 So.2d 905, 908 (¶ 8) (Miss.2001) (quoting In re Estate of Mask, 703 So.2d 852, 859 (¶ 35) (Miss. 1997)). In determining whether the error in admitting polygraph evidence is so severe as to require reversal, the Court must engage in a case-by-case analysis, looking to the "nature of the error and the circumstances attendant to [the evidence's] disclosure." Weatherspoon, 732 So.2d at 163 (¶ 15).
*1025 ¶ 28. In the recent case of Fagan v. State, 894 So.2d 576 (Miss.2004), the Mississippi Supreme Court engaged in the type of case-by-case analysis required in light of Weatherspoon. After careful examination, it reversed and remanded Mary Lynn Fagan's embezzlement conviction on the grounds that the jury had been allowed to consider inappropriate evidence of polygraph testing. Fagan, 894 So.2d at 580-81 (¶¶ 12-13). In Fagan, the State elicited testimony from its key witness that other suspects had taken polygraph examinations and had presumably passed them. Over repeated defense objections sustained by the trial judge, the State continued its line of questioning regarding the examinations. In doing so the State also violated the court's pre-trial order which prohibited the introduction of any evidence concerning polygraph examinations. Id. at 578-79(¶ 6). The court in Fagan also noted that the case against Ms. Fagan had been wholly circumstantial, and that the prejudicial effect of the inappropriate polygraph evidence was stronger in such a case. Taking all of these factors into account, the court found that Ms. Fagan had been deprived of a fair trial. Id. at 580-81 (¶¶ 11-13).
¶ 29. The present case is easily distinguishable from Fagan, wherein the jury was presented with evidence that two other suspects had cooperated with investigators and had actually taken polygraph examinations. Fagan, 894 So.2d at 579 (¶ 6). In Houston's case, no such proof was offered. The jury was merely confronted with the fact that Detective Clark requested that a polygraph test be administered. The jury was not presented with a suggestion that Houston had complied with or failed to comply with law enforcement's request that he take a polygraph test, nor was evidence presented suggesting that Houston passed or failed such an examination. Furthermore, Detective Clark's testimony in no way identified the subject of the proposed test.
¶ 30. Further distinguishing Houston's case from that in Fagan, the mention of the word "polygraph" arose during the district attorney's attempt to impeach Detective Clark's credibility. Clark testified earlier that he had stopped investigating the case at the behest of the District Attorney's Office, and the prosecutor was attempting to show that Clark had not in fact stopped work on the case. Thus the purpose of the evidence was not to prove the results of the test, but to decrease Detective Clark's credibility in the eyes of the jury. While the evidence in Fagan's case was wholly circumstantial, there was substantial direct evidence implicating Houston in the assault. Jane's account of the attack was corroborated by pictures and descriptions of her injuries, by testimony from a number of witnesses regarding her mental state after the assault, and by other evidence such as Houston's gun. Thus, the danger of undue prejudice that was present in Fagan is absent in Houston's case.
¶ 31. Although Houston contends that the district attorney intentionally violated the trial court's order that he could go no further than asking if the polygraph test was performed, it is not clear from the record that the prosecutor acted maliciously. The trial judge admitted that he "didn't specifically say" that the district attorney could not refer to the test by name, and thus there was no clear violation of the court's order. Further, the record shows no other evidence that the district attorney acted improperly. This is in stark contrast to the facts in Fagan, in which case the prosecutor elicited evidence that the trial court had unambiguously prohibited prior to trial.
*1026 ¶ 32. Mindful of Weatherspoon's mandate of a case-by-case analysis and in light of Fagan, this Court finds no reversible error in the district attorney's mention of Detective Clark's request to perform a polygraph examination. Particularly in light of the overwhelming evidence of Houston's guilt, such error is harmless. See Thornton v. State, 841 So.2d 170, 174 (¶ 18) (Miss.Ct.App.2003). Houston's assignment of error is without merit.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF PIKE COUNTY OF CONVICTION OF SEXUAL BATTERY AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS SUSPENDED AND FIVE YEARS' POST-RELEASE SUPERVISION, AND FINE OF $5,000, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.
NOTES
[1] The name of the victim has been changed to protect her identity.